THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| v. | : 3:15-CR-151 |
| | : (JUDGE MARIANI) |
| ANGEL PRADO, | : |
| | : |
| Defendant. | : |

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court is Defendant's Amended Motion to Suppress Physical

Evidence and Incrimination Statements, (Doc. 66). Defendant, Angel Prado, is charged with

a single count of possession of heroin with intent to distribute in violation of 21 U.S.C.

841(a). The present motion—which has had the benefit of two separate evidentiary

hearings and multiple briefings—seeks to suppress physical evidence obtained as a result

of a roadside car search and Defendant's subsequent statements to police. For the reasons

that follow, the Court will grant in part and deny in part Defendant's Motion to Suppress.

### II. BACKGROUND

On December 19, 2013, Pennsylvania State Trooper Paul Lindsay was patrolling a

section of Interstate 80 in Monroe County, Pennsylvania. (Doc. 74, 6/9/16 Tr., at 7; Doc. 84,

12/13/16 Tr., at 22-23). At the time, Trooper Lindsay was assigned to the Safe Highway

Initiative through Effective Law Enforcement Detection unit, or SHIELD unit. (Doc. 74,

6/9/16 Tr., at 5). In that role, Trooper Lindsay was "trained to look beyond the traffic stop for

indicators of criminal activity," including drug interdiction activities. (*Id*.). Slightly before

10:00 a.m., Trooper Lindsay noticed Defendant driving in the lane next to his. (*Id*. at 7, 25).

According to the Trooper:

> As I was traveling the left lane, the Defendant . . . was driving a Honda
> Odyssey. I saw him veering over into the shoulder of the road over into the
> fog line. It raised my suspicions. I don't know if he was falling asleep, or he
> was under the influence of something, or he was having a medical issue, and
> I took action.

(*Id*. at 7). Thereafter, at approximately 9:58 a.m., Trooper Lindsay initiated a traffic stop for

violation of 75 Pa. C.S. § 3309, driving on roadways laned for traffic. (*Id*. at 25-26; Doc. 84,

12/13/16 Tr., at 23).[1]

After both vehicles stopped, Trooper Lindsey contacted, via radio, the nearest State

Police Barracks and relayed the car's license plate numbers. (Doc. 84, 12/13/16 Tr., at 33-

34). Trooper Lindsey then approached Defendant's car and asked Defendant some

questions regarding where he was coming from, who owned the car, and whether

Defendant had a criminal history. (Doc. 74, 6/9/16 Tr., at 8-11). Defendant indicated that

he had never been arrested before. (*Id*. at 11). The Trooper later testified that, although

Defendant seemed to understand everything the Trooper was asking, English did not

appear to be his first language. (*Id*. at 10-11). Trooper Lindsey asked for Defendant's

---

[1] Trooper Lindsey's car was equipped with a video recording device and Trooper Lindsey had a
microphone on his person. As a result, the initial stop and everything that followed was captured on video
with sound. (Gov't Ex. 7).

2

credentials and noted that Defendant's hand was shaking as he handed his license to the Trooper. (*Id*. at 11).

Thereafter, Trooper Lindsey returned to his car and used the on-board computer to verify some of Defendant's information. (Doc. 84, 12/13/16 Tr., at 37). After inputting some of Defendant's data, Trooper Lindsey found that Defendant appeared to have two prior arrests for drug offenses under an alias name of Raul Garcia. (*Id*. at 37-38; Doc. 74, 6/9/16 Tr., at 12). Because the alias had a Social Security number associated with it, Trooper Lindsey returned to Defendant's car and asked Defendant for his Social Security number. (Doc. 84, 12/13/16 Tr., at 38-39; Doc. 74, 6/9/16 Tr., at 12). The Trooper then returned to his car and determined that the two Social Security numbers matched. (Doc. 84, 12/13/16 Tr., at 39). It was at this time that Trooper Lindsey placed a call to request a canine unit on scene. (*Id*.).

Trooper Lindsey then decided to issue Defendant a warning for the traffic offense and began the process of inputting Defendant's information into the on-board police computer in order to print out a written warning. (*Id*. at 40-41). Sometime during this process, a second State Trooper arrived with a canine unit. (Gov't Ex. 7). After completing the warning, Trooper Lindsey went back to Defendant's car and asked him to exit the car. (Doc. 84, 12/13/16 Tr., at 41; Doc. 74, 6/9/16 Tr., at 14-15). Trooper Lindsey then explained the warning and gave Defendant the warning and his credentials. (Doc. 84, 12/13/16 Tr., at 41; Doc. 74, 6/9/16 Tr., at 15-16). Immediately thereafter, Trooper Lindsey asked a series

3

of questions with respect to where Defendant was coming from and whether the car contained anything illegal. (Doc. 74, 6/9/16 Tr., at 15-16; Gov't Ex. 7). After less than two minutes of questioning, Defendant told Trooper Lindsey that, if the Trooper wanted to, he could check the car. (Gov't Ex. 7).

Soon afterward, Defendant signed a Spanish language version of the "Pennsylvania State Police Waiver of Rights and Consent to Search" form. (Doc. 74, 6/9/16 Tr., at 16; Doc. 84, 12/13/16 Tr., at 43; Gov't Exs. 2, 12). Trooper Lindsey also orally informed Defendant that Defendant could revoke his consent at any time during the search. (Doc. 74, 6/9/16 Tr., at 16-17). A subsequent search of the car uncovered six kilograms of heroin. (Id. at 22). Defendant was arrested and Trooper Lindsey advised him of his Miranda rights in English. (Doc. 74, 6/9/16 Tr., at 23-24). Defendant was questioned and made several incriminating statements. (Gov't Ex. 7). He was then taken to a police station where Trooper Francis Carito advised Defendant, in Spanish, of his Miranda rights. (Id. at 63). Defendant then answered some more questions and provided a written statement. (Gov't Ex. 8).

Defendant was eventually charged with a single count of possession of heroin with intent to distribute in violation of 21 U.S.C. 841(a). On November 30, 2015, Defendant filed the motion presently before the Court which seeks to suppress (1) the physical evidence obtained from the search of the car, and (2) Defendant's incriminating statements to police. (Doc. 66). A suppression hearing was held on June 9, 2016. Thereafter, the case was

transferred to the undersigned and Defendant requested a new evidentiary hearing. (Doc. 77). A second hearing was held on December 13, 2016. At that time, the parties requested that the Court consider evidence produced at both hearings when ruling on the motion. (Doc. 84, 12/13/16 Tr., at 3).

After the second hearing, the parties submitted briefs with their arguments. (Docs. 85, 87). On February 15, 2017, the Court issued an Opinion in which it expressed its concerns with whether the initial traffic stop was proper in light of the video evidence before the Court. (Doc. 91 at 2). The Court, however, noted that Defendant's brief stated that Defendant "does not contest the propriety of the initial stop." (*Id.*; Doc. 85 at 4 n.2). Therefore, the Court directed the parties to file additional briefs concerning whether Defendant's waiver of the issue precludes the Court from considering the propriety of the initial traffic stop and whether the initial stop was indeed lawful. (Doc. 91 at 7-8). The parties have submitted their supplemental briefs, (Docs. 93, 94), and Defendant's Motion is ripe for review. For the reasons that follow, the Court will grant in part and deny in part Defendant's Motion to Suppress.

## III. Discussion

In addition to the basis for which the Court directed the parties to brief, Defendant raises three other grounds for suppressing evidence in this case. The Court will address each in turn.

5

## A. Initial Traffic Stop

As discussed above, the Court directed the parties to brief the issues of (1) whether the Court may address the propriety of the initial traffic stop in light of what appears to be a waiver of this issue by Defendant's counsel, and (2) whether the initial traffic stop was valid. (Doc. 91 at 7-8). Both parties agree that the Court, despite Defendant's counsel's apparent waiver of the issue, may address the question of whether the initial traffic stop was valid. (Doc. 93 at 4-5; Doc. 94 at 2-3). The parties diverge, however, on the second question of whether the initial stop was valid. Specifically, Defendant argues that because the video shows that the car Defendant was driving did not cross the fog line, the stop was invalid. (Doc. 94 at 4). The Government argues that, even though the car never crossed the fog line, Trooper Lindsey's perception that it did was a reasonable mistake of fact, and therefore the stop is still valid. (Doc. 93 at 6-12).

The Fourth Amendment provides that individuals shall not be subject to "unreasonable searches and seizures." U.S. CONST. amend. IV. "[A] defendant who challenges a search or seizure typically bears the burden of proving that it was illegal." *United States v. Headen*, 264 F. App'x 244, 246 (3d Cir. 2008). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

6

"The United States Supreme Court has held that stopping a car and detaining its occupants is a seizure under the Fourth Amendment." *Id.* "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002). "A well-established exception to the Fourth Amendment's warrant requirement permits an officer to 'conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)). Accordingly, "[a] routine traffic stop is constitutional when it is supported by reasonable suspicion." *United States v. Gooch*, 915 F. Supp. 2d 690, 702 (W.D. Pa. 2012); *see also United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006) (holding that the "reasonable suspicion standard applies to routine traffic stops").[2] "Where reasonable

---

[2] Courts in Pennsylvania have found that "some offenses, by their very nature, require a police officer to possess probable cause before he or she may conduct a traffic stop." *Commonwealth v. Ibrahim*, 127 A.3d 819, 823 (Pa. Super. Ct. 2015). Thus, Pennsylvania has created a two tier system for traffic stops. The Pennsylvania Supreme Court has explained that "if the officer has a legitimate expectation of investigatory results, the existence of reasonable suspicion will allow the stop—if the officer has no such expectations of learning additional relevant information concerning the suspected criminal activity, the stop cannot be constitutionally permitted on the basis of mere suspicion." *Commonwealth v. Chase*, 960 A.2d 108, 115 (Pa. 2008). For traffic offenses falling into the latter category, the Court explained, "[a]n officer must have probable cause to make a constitutional vehicle stop." *Id.* at 116. With respect to the traffic offense at issue in the present case, 75 Pa. C.S. § 3309(1), Pennsylvania courts have held that the higher standard of probable cause is required to make valid stop. *See, e.g., Commonwealth v. Feczko*, 10 A.3d 1285, 1292 (Pa. Super. Ct. 2010).

Nonetheless, federal courts within the Third Circuit have not utilized a two tiered system like the one in use in Pennsylvania. Instead, federal courts within this circuit have regularly held that a police officer does not offend the Constitution when he or she initiates a traffic stop based on reasonable suspicion that a violation of the applicable traffic code has occurred. *See, e.g., Delfin-Colina*, 464 F.3d at 397; *Lewis*, 672 F.3d at 237; *United States v. Mosley*, 454 F.3d 249, 255 n.9 (3d Cir. 2006) ("A traffic stop

7

suspicion for the traffic stop is lacking, the evidentiary fruits of the traffic stop must be suppressed." *Lewis*, 672 F.3d at 237.

"Reasonable, articulable suspicion is a 'less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.'" *Delfin-Colina*, 464 F.3d at 396 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)). "In forming a reasonable suspicion, officers may rely on their own experience and knowledge." *United States v. Jones*, 506 F. App'x 128, 131 (3d Cir. 2012). "When determining whether an officer possessed reasonable suspicion to conduct a traffic stop, [a court] must consider the totality of the circumstances." *Lewis*, 672 F.3d at 237. Further, "an officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place. Consequently, a reasonable mistake of fact 'does not violate the Fourth Amendment.'" *Delfin-Colina*, 464 F.3d at 398 (quoting *United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003)); *see also United States v. Fleetwood*, 235 F. App'x 892, 895 (3d Cir. 2007) (noting that the standard for a traffic stop

requires only reasonable suspicion to believe that a traffic violation has been committed"); *Gooch*, 915 F. Supp. 2d at 702-03 n. 7 (noting that the appropriate standard for assessing the constitutionality of a traffic stop is reasonable suspicion and not probable cause).

It is black letter law that "evidence obtained in accordance with federal law is admissible in federal court—even though it was obtained by state officers in violation of state law." *United States v. Rickus*, 737 F.2d 360, 363-64 (3d Cir. 1984). Thus, even though a Pennsylvania court may have held that Trooper Lindsey required probable cause to pull Defendant over for a violation of 75 Pa. C.S. § 3309(1), the traffic stop does not offend the Fourth Amendment—as interpreted by federal courts—as long as Trooper Lindsey possessed reasonable suspicion that such a violation occurred. Thus, this Court will hold that the traffic stop at issue here was constitutionally valid as long as Trooper Lindsey had at least reasonable suspicion that a violation of the Pennsylvania traffic code occurred.

8

"is not particularly rigorous, as no traffic law need actually have been broken, nor does the stopping officer have to be correct regarding the facts").

In the case at hand, Trooper Lindsey testified that he pulled Defendant over for a violation of 75 Pa. C.S. § 3309(1). (Doc. 84, 12/13/16 Tr., at 23). That statute provides, in pertinent part, that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety." 75 Pa. C.S. § 3309(1). This statutory language—specifically the use of the phrase "as nearly as practicable"—"does not foreclose minor deviations" from marked lanes. *Commonwealth v. Enick*, 70 A.3d 843, 847 (Pa. Super. Ct. 2013). The statute does, however, prohibit drivers from "mov[ing] from the lane until the driver has first ascertained that the movement can be made with safety." Therefore, a violation of section 3309(1) occurs when a driver's "deviations from his lane of travel create[s] a significant safety hazard on the roadway." *Feczko*, 10 A.3d at 1292; *see also Commonwealth v. Thrower*, 2013 WL 11276824, at *5 (Pa. Super Ct. 2013) ("Thus, whether an officer possesses probable cause to stop a vehicle for a violation of section 3309(1) depends largely upon whether a driver's movement from his lane is done safely").

Here, because the seizure of Defendant occurred without a warrant, the Government bears the burden of showing that the seizure was reasonable. As the Court previously noted, the "clear video evidence . . . shows that Defendant Prado did not cross over the white fog line at any time." *United States v. Prado*, 2017 WL 630854, at *4 (M.D. Pa. 2017).

9

Defendant argues that, for this reason alone, the Court should find that the stop was invalid. (Doc. 94 at 4). The Government, in contrast, argues that Trooper Lindsey made a mistake of fact with respect to whether or not Defendant crossed the fog line. The Government further argues that the mistake was a reasonable one, and, therefore, Trooper Lindsey still possessed the requisite reasonable suspicion that the traffic code was violated. (Doc. 93 at 6-12). For the reasons that follow, the Court agrees that Trooper Lindsey made a reasonable mistake of fact and that Trooper Lindsey possessed reasonable suspicion that Defendant violated 75 Pa. C.S. § 3309(1).

At the first suppression hearing in this case, Trooper Lindsey testified that he saw Defendant's car veer onto the shoulder of the road, that the car failed to correct itself, and that the car travel on the shoulder for seconds. (Doc. 74, 6/9/16 Tr., at 25-27). Trooper Lindsey further testified that there was snow on the shoulder of the road and that he pulled the car over due to safety concerns. (*Id.* at 27, 28). According to his testimony, Trooper Lindsey believed the car's driver might be sick or under the influence and the Trooper "made a quick decision to effectuate the stop. It was a matter of seconds." (*Id.* at 26).

Although a review of video evidence in this case reveals that Defendant's car did not cross the fog line and drive on the shoulder of the road, the Court is aware that this whole episode occurred in a relatively short amount of time and that Trooper Lindsey did not have the benefit of carefully reviewing the video before he decided to pull Defendant's car over. Instead, Trooper Lindsey was making his observations while still safely operating his motor

10

vehicle at highway speeds. Considering these circumstances—and in light of the fact that the video shows Defendant's car did veer towards the shoulder and touch the fog line—the Court finds that Trooper Lindsey's mistake of fact was a reasonable one. Further, in light of Trooper Lindsey's testimony regarding the presence of snow on the shoulder of the road, Defendant's car veering onto the shoulder had the potential of creating a safety hazard. Accordingly, the Court finds that Trooper Lindsey possessed reasonable suspicion that Defendant violated 75 Pa. C.S. § 3309(1).

The Court is aware that, given Pennsylvania's case law on section 3309(1), see Prado, 2017 WL 630854, at *2-*3, a Pennsylvania court reviewing these same facts would likely have reached a different result. This Court, however, is bound to apply the Fourth Amendment standard as laid out in controlling federal precedent. See Rickus, 737 F.2d at 363-64. Pennsylvania's choice to apply a higher standard—probable cause—to traffic stops of this type has shaped its case law. Nevertheless,

> [i]n determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an *independent inquiry*, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed.

Elkins v. United States, 364 U.S. 206, 223-24, 80 S. Ct. 1437, 4 L. Ed. 2d 1669 (1960) (emphasis added).

In sum, the Court finds that the initial traffic stop was based on reasonable suspicion and therefore did not violate the Fourth Amendment. Accordingly, the Court will deny

11

Defendant's Motion to Suppress on this basis. In so ruling, however, the Court notes that this outcome is largely a result of the lower federal standard of reasonable suspicion. Trooper Lindsey's decision to stop Defendant's car when he did barely passes constitutional muster and the Court is dismayed that such a highly trained Pennsylvania State Trooper would approach the boundaries of unconstitutional action so closely.

## B. Length of the Traffic Stop

Next, Defendant argues that Trooper Lindsey lacked reasonable suspicion for an investigatory detention and that he prolonged the traffic stop in an unreasonable manner such that it violated the Fourth Amendment. (Doc. 85 at 2-6). As discussed above, the Fourth Amendment protects the public from "unreasonable searches and seizures" by the government. U.S. CONST. amend. IV. "[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'" *United States v. Jacobsen*, 466 U.S. 109, 124, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984). "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614, 191 L. Ed. 2d 492 (2015) (internal citations omitted). "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' Typically such inquiries involve checking the driver's license, determining whether there are

12

outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1615 (alteration original) (internal citation omitted) (quoting *Illinois v. Caballes*, 543 U.S. 405, 408, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005)).

"Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 1614. "An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 1615. Nevertheless, during a traffic stop, "an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003).

Here, Defendant argues that Trooper Lindsey did not have reasonable suspicion to conduct an investigatory detention and that he unconstitutionally prolonged the traffic stop in order to conduct a canine sniff of Defendant's car. (Doc. 85 at 2-6). As discussed above, the initial stop was predicated on reasonable suspicion that Defendant violated a provision of the Pennsylvania traffic code. After pulling Defendant's car over—the initial seizure in this case—Trooper Linsey began the process of determining whether to issue a traffic ticket, and, in doing so, conducted permissible inquiries incident to the traffic stop such as checking for outstanding warrants. This process included: (1) initially informing dispatch that he made the traffic stop and relaying the car's license plate number to them; (2) talking

13

with Defendant to ascertain if he was sick, falling asleep, or under the influence; (3)

collecting Defendant's credentials and inputting them into the computer in the police vehicle;

(4) sorting out Defendant's criminal history in light of Defendant's prior use of an alias; (5)

asking Defendant for additional information to verify the use of the alias; (6) writing out a

warning for the traffic violation; and (7) explaining the warning to Defendant and returning

his credentials. The span of time that elapsed from the initial traffic stop to the return of

Defendant's credentials was approximately thirty minutes.[3] Then, after Defendant's

credentials were returned to him, a second seizure occurred when Trooper Lindsey

proceeded to question Defendant after the traffic warnings were issued. This questioning

continued for one to two minutes before Defendant offered to let Trooper Lindsey search his

car and the Trooper began the process of obtaining written consent for the search. (Gov't

Ex. 7).

Initially, the Court finds that the duration of the initial traffic stop—up until the time

that the warning was issued—was not unreasonable. There is no indication that Trooper

Lindsey failed to act with diligence in investigating the traffic violation and in conducting

permissible inquiries incident to the traffic stop. *See United States v. Byrd*, \_\_\_ F. App'x

\_\_\_, 2017 WL 541405, at *3 (3d Cir. 2017) (finding a thirty-nine minute stop not

---

[3] At the suppression hearing, Trooper Lindsey testified as follows: "If my memory serves me correctly, I believe consent was given at 10:35 and the initial stop was at 9:58, so that's roughly 37 minutes." (Doc. 84, 12/13/16 Tr., at 31). This time period, however, included events that occurred after the traffic enforcement portion of the detention ended. A review of the video evidence reveals that the traffic stop itself—from the time Trooper Lindsey pulled Defendant's car over to the time Trooper Lindsey handed Defendant his credentials and the warning—was approximately thirty minutes. (Gov't Ex. 7).

unreasonable when there was no evidence that the officer failed to act diligently during the traffic stop, the officer experienced problems with the on-board police computer, and identifying the driver was complicated by the driver's use of an alias and lack of photo identification). Instead, the primary reason for the delay appears to be that the Trooper's check of Defendant's identity and criminal history was complicated by Defendant's prior use of an alias. Trooper's Lindsey's diligent investigation into these matters does not render the traffic stop unreasonable. See Id.

Further, while the request for a canine unit was an "unrelated inquiry" with respect to the initial traffic stop, there is no indication that it prolonged the stop any greater amount of time then was already necessary to issue the traffic warning. Nonetheless, even if the traffic stop was delayed by Trooper Lindsey's unrelated inquiries and his request for a canine unit, as discussed below, at some point during the traffic stop Trooper Lindsey developed reasonable suspicion that criminal activity was afoot. Thus, reasonable suspicion justified an expanded investigatory detention beyond the initial traffic stop.

At the suppression hearing, Trooper Lindsey identified the following observations that drew his suspicion during the traffic stop: (1) Defendant was coming from Chicago and going to Providence, Rhode Island, along a known drug corridor; (2) the car Defendant was driving did not belong to him; (3) Defendant initially told Trooper Lindsey that he was coming from Pennsylvania but then later said he was coming from Chicago; (4) the car had

15

excessive air fresheners in it;[4] (5) a business suit was hanging in the car;[5] (6) Defendant

appeared nervous during the interaction and his hand was shaking; and (7) Defendant said

that he had never been arrested before but actually had two prior drug arrests made under

an alias. (Doc. 74, 6/9/16 Tr., at 8-14). Taken together, and in light of Trooper Lindsey's

experience and training in recognizing signs of drug trafficking, these factors are sufficient to

support a finding of reasonable suspicion. Accordingly, it was not unreasonable for Trooper

Lindsey to expand his initial inquiry beyond the scope of the traffic infraction. It was also not

unreasonable for Trooper Lindsey to detain Defendant after the traffic stop had ended to

investigate his suspicions.

Defendant, in his brief, attacks each of the Trooper's observations one by one. (Doc.

85 at 5-6). In effect, Defendant argues that each factor relied upon by the Trooper, in

isolation, is explainable, and thus does not amount to reasonable suspicion. The Supreme

Court, however, has rejected "this sort of divide-and-conquer analysis" and instead adopted

a "totality of the circumstances" approach. *United States v. Arvizu*, 534 U.S. 266, 274, 122

S. Ct. 744, 151 L. Ed. 2d 740 (2002). Under this approach, "the whole picture . . . must be

taken into account," *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed.

2d 621 (1981), and a police officer is permitted "to draw on their own experience and

specialized training to make inferences from and deductions about the cumulative

---

[4] Trooper Lindsey explained that air fresheners "are commonly used by traffickers to mask the odor of illegal narcotics that are in the vehicles." (Doc. 74, 6/9/16 Tr., at 9).
[5] Trooper Lindsey explained that he had read intelligence briefings that indicated that this tactic is commonly used by drug traffickers "to legitimize themselves in vehicles." (Doc. 74, 6/9/16 Tr., at 34).

16

information available to them that 'might well elude an untrained person,'" *Arvizu*, 534 U.S. at 273 (quoting *Cortez*, 449 U.S. at 418). Thus, in the present case, although "[a]ny one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel . . . taken together they amount to reasonable suspicion." *United States v. Sokolow*, 490 U.S. 1, 9, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989). Accordingly, the Court will deny Defendant's Motion to Suppress on this basis.

## C. Consent to Search

In his initial brief filed before the evidentiary hearings, Defendant argued that the consent Defendant gave to search the car was not a knowing and voluntary waiver of his Fourth Amendment rights. (Doc. 66 at 7-8). Defendant, however, did not pursue this argument in his brief submitted after the evidentiary hearings. Nevertheless, the Court will briefly address Defendant's argument here.

Consensual searches do not violate the Fourth Amendment "because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." *Florida v. Jimeno*, 500 U.S. 248, 250-51, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973) ("It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."). "Consent must be voluntary, may be express or implied, and need not be knowing or intelligent." *United States v. Lockett*, 406 F.3d 207, 211 (3d Cir. 2005); *see also*

Schneckloth, 412 U.S. at 235-46 (holding that consent to a search need not be knowing or intelligent). When making a determination about the voluntariness of consent, courts are to consider "the totality of the circumstances," including such factors as: "the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment." *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009). "The government has the burden of proving by a preponderance of the evidence that the search was made pursuant to a voluntary consent." *United States v. Velasquez*, 885 F.2d 1076, 1081 (3d Cir. 1989).

Here, the Court finds that Defendant voluntarily consented to the search. Initially, without Trooper Lindsey asking to search the car, Defendant told the Trooper that the Trooper could "check" the car. (Doc. 74, 6/9/16 Tr., at 16). Thereafter, Trooper Lindsey told Defendant that "at any point in time if you want us to stop the search, you just tell me, and we will stop the search." (*Id*. at 16-17). Trooper Lindsey also gave Defendant a consent form, in Spanish, which Defendant signed indicating that he consented to the search. (*Id*. at 17; Gov't Ex. 2). This all occurred while Defendant stood outside of the car with Trooper Lindsey. There was no overwhelming show of force. No one threatened, coerced, or promised anything to Defendant. He was not arrested or put in handcuffs at that time and there was no prolonged questioning. Defendant was even advised, orally and in writing, of his right to end the search at any time.

18

In short, every indication in the record points to the conclusion that Defendant voluntarily consented to the search of the car. Accordingly, the Court will deny Defendant's Motion to Suppress on this basis.

## D. Confession

Finally, Defendant argues that statements he made to police both on the roadside and at the police station should be suppressed. The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. "[T]he privilege against self-incrimination protects individuals not only from legal compulsion to testify in a criminal courtroom but also from 'informal compulsion exerted by law-enforcement officers during in-custody questioning.'" *Pennsylvania v. Muniz*, 496 U.S. 582, 589, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990) (quoting *Miranda v. Arizona*, 384 U.S. 436, 461, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). In an effort to ensure these rights are protected, the United States Supreme Court has held that the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. Commonly known as the "*Miranda* warnings," a defendant in police custody

must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an

19

attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479.

"[A] suspect informed of his right to counsel and right to remain silent may waive those rights if the waiver is 'made voluntarily, knowingly and intelligently.'" *Velasquez*, 885 F.2d at 1086 (quoting *Miranda*, 384 U.S. at 444). Thus, to determine whether statements made during a custodial interrogation are admissible, Courts are instructed to examine "the totality of the circumstances surrounding the interrogation," and "ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel." *Fare v. Michael C.*, 442 U.S. 707, 724-25, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979). Accordingly, when analyzing a waiver,

[a] court will inquire first, whether "the relinquishment of the right [was] voluntary in the sense that it was the product of a free and deliberate choice," and second, whether the waiver was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

*United States v. Whiteford*, 676 F.3d 348, 362 (3d Cir. 2012) (second alteration original) (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)). The Government bears the burden of proving that a defendant waived his or her Fifth Amendment rights by a preponderance of the evidence. *Velasquez*, 885 F.2d at 1086.

Here, Defendant argues that the incriminating statements he made to police on the roadside after his arrest and at the police station should be suppressed because he was not properly given his *Miranda* rights. (Doc. 66 at 8; Doc. 85 at 7-8). It is clear—and neither

20

party argues to the contrary—that Defendant was subjected to a custodial interrogation both on the roadside after his arrest and at the police station. Thus, the only questions presented to this Court are (1) whether Defendant's incriminating statements were voluntarily made and (2) whether the waiver of his rights was made knowingly and intelligently. With respect to the first question, Defendant makes no argument that his decision to talk to police was involuntary. Additionally, the Court finds the circumstances surrounding Defendant's statements indicate that Defendant was not coerced and that his decision to talk to the Troopers "was the product of a free and deliberate choice." Accordingly, the Court finds that Defendant voluntarily waived his Fifth Amendment rights on both the roadside and at the police station.

With respect to the remaining question, the Court will address each waiver separately. In the case of the roadside interrogation, after Defendant was arrested, Trooper Lindsey verbally advised Defendant of his *Miranda* rights in English. (Doc. 74, 6/9/16 Tr., at 23-24). A review of the video evidence, however, shows that Trooper Lindsey did so in a rapid fashion. (Gov't Ex. 7). Additionally, Defendant never unambiguously acknowledged that he understood his rights as they were read to him. (*Id.*). Instead, after finishing the *Miranda* warnings, Trooper Lindsey immediately added "I can have someone come up, Spanish speaking, to inform you, okay," to which Defendant responded "okay." (*Id.*). Trooper Lindsey then added "knowing what I just told you -- you understand your rights, you've been here long enough, right," to which Defendant responded "yes." (*Id.*). Because

of how Trooper Lindsey phrased this question, however, it is unclear whether Defendant was indicating that he understood his rights or instead indicating that he had "been here long enough."

Although Defendant could speak and understand some English, it is clear from the video that he had some trouble understanding what Trooper Lindsey was saying from time to time. Trooper Lindsey repeated his questions on numerous occasions and even slowed down what he was saying in at least one instance. Given the not inconsequential language barrier, the fact that Trooper Lindsey talked quickly and asked compound questions, and the fact that Defendant never clearly stated that he understood his rights, the Court finds that the Government has failed to meet its burden to show that Defendant waived his rights knowingly and intelligently on the roadside. The Court, therefore, will grant Defendant's Motion to Suppress insofar as it concerns the statements that Defendant made on the roadside after his arrest.

The circumstances are different, however, with respect to the statements that Defendant made at the police station. There, Defendant was given his *Miranda* rights, in Spanish, before making any written or oral statements. (Doc. 74, 6/9/16 Tr., at 63; Doc. 84, 12/13/16 Tr., at 9). Defendant argues, however, that he did not sign a *Miranda* rights waiver form, and that the Trooper who read him his *Miranda* rights may have not translated them

into Spanish correctly.[6] (Doc. 85 at 7-8). Defendant also argues that the Trooper's use of an application on his phone to read Defendant his *Miranda* rights in Spanish is suspect. (*Id.* at 8).

At the suppression hearings, Trooper Carito testified that, before Defendant made a statement at the police station, Trooper Carito advised Defendant of his *Miranda* rights in Spanish and Defendant indicated he understood those rights. (Doc. 74, 6/9/16 Tr., at 63; Doc. 84, 12/13/16 Tr., at 9). Although no written waiver form was signed, such a written waiver is not required to prove a valid waiver. Instead, a defendant's "subsequent willingness to answer questions after acknowledging that [he] understood [his] *Miranda* rights is sufficient to constitute an implied waiver." *United States v. Velasquez*, 626 F.2d 314, 320 (3d Cir. 1980). In this case, Defendant acknowledged that he understood his rights and then proceeded to provide statements both orally and in writing.

Defendant, however, contends that there is no basis for this Court to conclude that Trooper Carito accurately translated the *Miranda* warnings into Spanish. Specifically, Defendant takes issue with Trooper Carito's use of a phone application to aid him in reading the *Miranda* rights in Spanish.

---

[6] Defendant also argues that "Trooper Carito did not know anything about Mr. Prado's educational background, or any possible merital [sic] disabilities." (Doc. 85 at 7). Defendant notably does not argue that Defendant has any mental disabilities or that his educational background indicated any lack of capacity to understand his rights. Nor is there any indication in the record that Defendant did not understand his rights when they were presented to him in Spanish. Instead, Defendant indicated that he understood and then wrote out an articulate statement in Spanish. Accordingly, there is simply no basis in the record for this Court to conclude that Defendant was unable to comprehend his rights as explained to him.

23

Trooper Carito testified that although he is not fluent in Spanish—a term for which

Trooper Carito applied a particularly demanding definition—he is able to converse

effectively in Spanish. Specifically, Trooper Carito testified as follows concerning his

Spanish speaking ability:

> I do believe I can hold my own, so to speak. I've never had an instance where
> I was unable to communicate with another individual. There are certainly
> times where we need to clarify vocabulary and ask questions in different
> manners, but I do believe I can hold my own, yes.

(Doc. 84, 12/13/16 Tr., at 19). With regard to the use of the phone application, Trooper

Carito testified as follows:

> Q. Could you tell the Court how you advised him of his *Miranda* rights, prior to
> this particular statement?
> A. I utilized an application on my phone, Mavro Police Spanish. I routinely use
> this application when advising Spanish-speaking individuals of their rights so
> that I know, as a matter of practice, that I'm using the same terminology each
> time that I do so.
> Q. Is it the same terminology that is normally used in the written *Miranda*
> form, when you use an English-written *Miranda* form?
> A. It is.

(*Id.* at 16).

The Court is therefore satisfied that Defendant was accurately advised of his

*Miranda* rights in Spanish. This is not the case where a police officer who did not speak

Spanish used an aid to translate the *Miranda* warnings into another language with no

independent awareness of what he or she was saying or any knowledge of the

accurateness of the translation. Trooper Carito was candid about his skill in speaking

Spanish and was confident that he delivered the *Miranda* warnings accurately in Spanish.

24

The fact that the Trooper utilized an application to ensure that he always used the exact same terminology each time he delivered the *Miranda* warnings in Spanish is of no moment because he was independently aware that what he was saying was accurate. Accordingly, the Court finds that Defendant knowingly and intelligently waived his rights at the police station. The Court will therefore deny Defendant's Motion to Suppress with regards to any statements made after he received his *Miranda* warnings at the police station. [7]

## IV. CONCLUSION

For the reasons outlined above, this Court will grant in part and deny in part Defendant's Motion to Suppress. A separate Order follows.

---

[7] Although Defendant does not advance any arguments in this vain, the Court notes that "a post-*Miranda* statement [is] not . . . automatically excluded because of an earlier, pre-*Miranda* confession." *United States v. Kiam*, 432 F.3d 524, 531 (3d Cir. 2006). The crucial preliminary question is whether the failure to give *Miranda* warnings was intentional or inadvertent. *Id*. at 531-32. When police intentionally withhold *Miranda* warnings, "the second confession [can] still be admitted if 'curative' measures [are] taken—for example, a sufficient break in time or circumstances between interrogations, or a warning to the suspect that the first statement could not be used against him." *Id*. at 532 (citing *Missouri v. Seibert*, 542 U.S. 600, 622, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004) (Kennedy, J., concurring)). In contrast, when the failure to give proper *Miranda* warnings is inadvertent, courts must "'examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his [initial] statements.'" *Id*. at 531-32 (alteration original) (quoting *Oregon v. Elstad*, 470 U.S. 298, 318, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985)). "Where no coercion is found, 'a careful and thorough administration of *Miranda* warnings cures the condition that rendered the unwarned statement inadmissible.'" *Id*. at 532 (quoting *Reinert v. Larkins*, 379 F.3d 76, 90 (3d Cir. 2004)).

Here, the Court has no problem concluding that Defendant's roadside statements did not taint his subsequent confession at the police station. There is no indication in the record that Trooper's Lindsey's deficient delivery of the *Miranda* warnings was an attempt to circumvent the *Miranda* decision. Trooper Lindsey made an attempt, albeit an inadequate one, to advise Defendant of his rights. This, in contrast, is not a case where "police engaged in [the] . . . practice of questioning defendants without issuing *Miranda* warnings in an attempt to induce subsequent waivers under the pressure of previously elicited statements." *United States v. Yamba*, 407 F. Supp. 2d 703, 717 (W.D. Pa. 2006). As the Court has already determined that both statements that Defendant gave were voluntary, the Court finds that Defendant's roadside statements given prior to making a knowing and intelligent waiver of his *Miranda* rights do not render his police station statements inadmissible.

Robert D. Mariani
United States District Judge